You may proceed. May it please the court and counsel, I'm Sean Wade with the Assistant U.S. Attorney with the Northern District of Iowa representing the United States in this matter. We have a government's appeal in this case over the district court's suppression of four consecutive 60-day each GPS tracker warrants regarding the defendant. We argue before this court that the district court erred in finding the Leon Good Faith exception. Did not apply to each and every one of those four search warrants when it was entirely reasonable for each of the officers to have relied upon the validity of the search warrant and the seizure of the evidence tracking data. Counsel, I think you flipped the standard. You say it's entirely reasonable. Do you want to undertake that burden? It's not entirely unreasonable. Correct. I misspoke in that in slight terms. We use negatives in law. It's crazy, but it is a different standard. It is. It is. But the court found, and it is a high standard, which this court has said that we're going to be careful to dilute that standard when examining it because it's not the kind of language that is often used by the Supreme Court or any court in regards to- Well, to focus you, the other side says you've got nexus to a car and nothing else. That's the issue in this case. Well, what do you have? Do you have anything besides nexus to a car? Well, we have the primary drug trafficker. We have information on the primary drug trafficker, Garcia Jimenez, trafficking at that residence. And then we have the car, defendant's car, going to and from that residence twice, once right before drug transaction. Then we have, subsequent to that, we have extensive phone conversations or contacts between the two over the course of- they're overlapping two-month periods, but January to February, approximately, and later January or early February into April in regards to 144 over 50 days, 245 over about 63 days, contacts between those two people. But what's consistent with it is that in the defendant's phone, he's also contacting two regularly known, named in the search warrant, drug dealers coming from the Denison area, which also is tied to the overall investigation of the drug trafficking organization as being from Worthington, Minnesota to Denison, Iowa. Are those the first two applications you're talking about? I'm talking about- I'm reaching over three, essentially. But the first application details the drug trafficking organization and its connection between Worthington and Denison. Which application was it that you had evidence of an actual involvement in a drug transaction? The actual involvement of the hand-to-hand by the defendant was in the third search warrant. That's the third search warrant. You've got more in number three. Number three, there's a number of things, but the primary, I guess, gold standard in that particular search warrant is they order up drugs from Garcia Jimenez, the known drug trafficker or leader of the organization as they knew it, and he directs them to a face-to-face, hand-to-hand with the defendant at a residence. That's a considerable increase over the information you had before, it seems to me. It corroborated what we thought we had, but that's exactly what you're saying is exactly true. That is the primary gold standard there. He did the hand-to-hand on March 9th, I believe, after being directed to that location by Garcia Jimenez. The good-faith analysis for the first two warrants depend on the defendant's relationship to the car, or Nexus, as my colleagues much more eloquently say. Right. Is there anything more? I guess you will concede that there was nothing more than the relationship to the vehicle? Well, no. You don't want to concede it, but is there anything more? There isn't a lot more. What there is is the focus of the GPS search warrant one, there's a great deal of information about the drug trafficking organization, and then there's even more about Garcia Jimenez and his residence where drug trafficking did control buys there. Then you have the connection of the car to that particular residence, and you have the connection of that car to that residence with the defendant twice. We have the car dropping off Garcia Jimenez in November, just before a drug deal, and then we have the defendant picking up and driving Garcia Jimenez around on, I believe it's December 12th. So he's connected to the car, connected to Garcia Jimenez, and the drug trafficking is connected to Garcia Jimenez. The whole purpose of this particular GPS warrant, and there were others that they were doing, is to find out who Garcia Jimenez was associating with with drug trafficking at his residence he was dealing, and people were coming and going. They were trying to tie and follow who was dealing with him, both above him and below him on the scale. It's later that you get, they do a pen register that is going on in December and January and into February on Garcia Jimenez that ties in the defendant, but that doesn't come into play until the second search warrant because that's when that information is detailed. And then in the third search warrant, they have, at the same time, or kind of subsequent and overlapping to that pen register on Garcia Jimenez, they have a pen register on the defendant, and the defendant's pen register even gives more information about the drug trafficking or the phone contacts between him and Garcia Jimenez mixed with, yes, GPS data that shows the short-term trafficking between or short-term driving between Lopez Zuniga and Garcia's residence and Lopez Zuniga's vehicle and Denison, another point of origin for drug trafficking in Iowa, basically Denison to Worthington and back. You've only mentioned Leon in good faith. I'm wondering, do you not think that at least one or two of these warrants are supported by probable cause? I believe all four are supported by probable cause. I concede that one and two is close, and it's very limited information, as Judge Willman brought out. Three and four, once you get the drug transaction and you get the more detailed data regarding their travels and their phone records between known drug traffickers in addition to Garcia Jimenez and Garcia Jimenez, those three and four are solidly probable cause-based when you have a drug trafficking deal between the two of them. Now, district court and magistrate court found fault with three and four with regard to a lack of connection to the vehicle, but the lack of connection vehicle is established way up front. I mean, the connection and the nexus between the vehicle and the defendant and Garcia Jimenez is established in Search Warrant 1 with the two transactions. Although they're a search, they're not a search of the vehicle. No, they're a search of the location. Those nexus cases are not particularly in point. True. Just a tracker case. If there was probable cause for warrants three and four, would we be effectively creating a per se rule that probable cause exists to track a vehicle of anybody suspected of drug trafficking? No. I think the district court kind of as an aside kind of implied that or considered that or noted that that's a possibility. I don't think that's a possibility in this case. This case is very fact-driven. I mean, I come out here and you're immediately asking me about specific facts. There's four search warrants. They have specific facts in each one. Some overlap. Some don't. Some are better written than others. But I think that when you look at three and four, particularly when you have, and I don't know that you have to look too much farther than the fact that you have known drug traffickers in Garcia Jimenez and the defendant as evidenced by a drug deal that goes from one to the other as orchestrated, similar to what Garcia Jimenez's mode of operation with others. And then you have the short-term traffic between them. You have the phone contacts between them. You have the phone contacts between Lopez Zuniga's phone and known drug traffickers in the Denison area, which is also connected to the drug trafficking organization. I think you just have piece by piece by piece. One of the things the district court faulted, though, is at the end, the officer put in of warrant three, the officer put in that the phone data, which was accurate, showed that he had gone to Mexico. So the magistrate court, as found by the district court, found that significant. There's no understanding at that point, no record as to how long he would be there or why he left or why he was there. That's not in the record. They just put in that the phone showed he went to Mexico, and then search warrant four comes back around and says, he's back. We got border patrol records that shows he was in Mexico. His phone was in Mexico. Border patrol records show that he came back. Coincides immediately with that day, that vehicle traveling. And then next day, the vehicle traveling to Garcia Jimenez's, the drug leader's, house overnight, and then back to Denison. Again, four supports three. Three is kind of the crux of this all, where probable cause is readily apparent. And then four supports it by virtue of putting Lopez Zuniga's vehicle back in the mix again, consistent with what was noted in search warrant three's data. I think one of the questions you need to look at here is, in short, and we're asserting that the district court didn't really look at this with a common sense, practical approach of the totality of the circumstances in its analysis, particularly with regard to three and four. Instead, the court looked at it in kind of a hyper-technical way and looked at innocent explanations for this, this, and this, whether it be the phones, whether it be the driving. But I think the way the case law sets forth is that you look at it with a practical, common sense approach and see whether it's good enough. So the question, I guess, in turning it around a bit is, it's not whether these search warrants could have been better, could have been written better. It's whether they were good enough based on the information that they put forth. You have quite a bit of data in search warrants one and two. More of the focus is on the organization and the overall picture and drug trafficking of Garcia Jimenez. Then the connection to the defendant and his car and Garcia Jimenez. And then three and four provide much more data regarding Lopez Zuniga's drug trafficking hand-to-hand with Garcia Jimenez, as evidenced by the control by. In this case, in regards to three and four, but also with regard to one and two, the courts apply kind of a piecemeal approach to nitpicking this and this and this, and there were some valid concerns. But when you look at the totality of it, as brought out here, you have a controlled drug by in which the defendant participated in as ordered by Garcia Jimenez. And we have some ample evidence in support for this court's consideration of a tie to a vehicle, much like this court has done in a series of cases on a tie to a house, even when there's limited evidence of that particular house being involved. A lot of this is in the Schimmerhorn case, a district court case, I think Eastern District of Missouri. But the court went through an analysis there and looked at and basically set forth kind of a buttressing argument to what we're arguing here, that you can look at that the car was, there's a probability the car was involved and there could be evidence of the car's involvement, as Judge Arnold said, in traveling in regards to these particular drug deals from the other evidence that we set forth in the affidavits. There's known drug traffickers, known drug traffickers' contact, phone contact. There's phone contact in Search Warrant 1 that shows that Garcia Jimenez was using cell phones in order to set up those deals. That is known throughout, and it's known by the officers in each of theirs, and something that they can reasonably rely upon. So were you going to save any time? Yes, I'm going to save two minutes, so I will stop at this point. Thank you. We'll hear from counsel for the appellee. May it please the court, counsel. I'm going to raise the lectern just a little bit. There's a button down there. Thank you. Good morning. You'll proceed, and your name again is? Jim McGow. I'm a CJA lawyer from the Northern District. I'll stop you there, but I noted that, and the court wants you to know that we deeply appreciate your willingness to accept the assignment. Thank you. My pleasure. The probable cause in these four warrants is so lacking that any reliance by any officer is entirely unreasonable. As counsel indicated before, it's very fact-specific, so it's important to understand what are the facts that support these four warrants. So the first warrant is based upon a deal on November the 24th of 2015 where they've got a cooperating individual. They take this individual. You have a very powerful voice, so would you lower the lectern a little bit? Good? A little more. Very well. Thank you. Okay. A cooperating individual is taken over to an apartment building where they believe that this main target, Garcia Jimenez, resides. The individual goes in. There's no indication in the search warrant that he's searched beforehand. He goes in, comes out, says that Garcia Jimenez is out of methamphetamine and won't have any methamphetamine until November the 30th. They search him, and they find that he's got some methamphetamine on him. No indication that he got it from inside. There's no surveillance of what apartment he went into. Did he even meet with Garcia Jimenez or somebody else? And then there's a notation that sometime prior to seeing this cooperating individual go inside of the apartment building, my client's vehicle is seen dropping off an individual who, quote, resembles Garcia Jimenez. No identification that it is Garcia Jimenez. No indication of when that drop-off is in conjunction with the CI going in and supposedly obtaining drugs that he does not, even though he's cooperating, he does not turn over to law enforcement. They have to search him to get from him. So that's one fact, and the only other fact that they have in warrant number two is that on December the 15th, my client was seen, or my client's car, I don't know that my client was ever identified in either situation as being the driver of the car, but my client's car was seen driving Garcia Jimenez to South Dakota to a mall and to a restaurant. That's it. No indication that either one of those actions had anything to do with any nefarious activity, drug activity, illegal activity at all. That's warrant one. Let's see. Who else was in the car then? They just claim that it's my client and Garcia Jimenez, who's the subject of the, that they believe is the primary target of the drug conspiracy. But they only go to a mall and to a restaurant out of town. That's it. And then they return. On the second warrant, in addition to those first two facts, they indicate that my client's car was seen at the Garcia Jimenez's apartment building nine times in approximately 45 days. No indication of surveillance of where my client went. No indication of seeing my client associate with Garcia Jimenez either going into or coming out of. No indication of how long the car was there during those times. No indication that he was actually there to visit or spend any time with Garcia Jimenez. No indication. We know that Garcia Jimenez is, according to the affidavit, lives in apartment number 23. But we don't know how many apartments are in this complex. We don't know how many residents are there. We don't know anything. There's nothing in the affidavit that suggests that he's hanging out or spending time involved in any drug conspiracy or even with Garcia Jimenez. There's an indication further that he travels to Denison four times. Three of those four times are overnight. And in that same affidavit, they do acknowledge that my client's brother lives in Denison, Iowa. So three out of four visits, he goes to Denison. He stays overnight. No indication of what address he goes to in Denison or what he's doing. Well, I'll interrupt by saying, as I read the briefs, I'll reveal my age here. Is this indicative of the mood of the country back after World War II, the early 50s, guilt by association? Yes, purely. Let's see. I can remember that vividly. Judge Arnold was probably still in short pants. Didn't Hollywood make a movie of it, Scoundrel Time, with Robert De Niro, which I did not see and have no intention of watching? Could be. The McCarran Committee. Well, anyway, it reminded me of that in a way. But, of course, the government says there's much more. Now, you have mentioned this, many phone contacts. How many phone contacts were in the third or fourth? Let's talk about that. I noticed you haven't talked about that. Yeah, let's talk about that. So in the second warrant, 154 contacts over 45 days. 154 contacts over about 45 days. I thought third and fourth had even more phone contacts, a lot more. Third has 245 phone calls over 80 days. So it's 154 over about 45 days and then 245 over 80 days. Now, what's significant about that is they indicate that these two individuals, my client and Garcia-Jimenez, text and call. And then they indicate that there's contacts between the two phones, 245 times on the third warrant, 154 times on the second warrant. I don't know what that means. There's no indication of what that means. Is saying, how's your mother? She's fine. Good to hear. Thanks for asking. Is that four contacts or one? Are we dividing out text or phone calls? How long are these phone calls? Are they before or after drug buys? I appreciate that argument. But on the flip side, it appears that what these warrants really are, are patchwork of innocuous facts strung together to look nefarious. Again, what is the test, as Judge Benton correctly stated early on in the argument? Is it a reasonable probability or reliability? Well, there's got to be probable cause, first of all. More than just a hunch, not a magic lamp that the government can rub. But it's got to be something more than a hunch, more than mere speculation. There's got to be articulable facts that there's some kind of illegal contact, some kind of illegal conduct going on between these two persons. That's number one. And you'd say that if I said that don't the facts set forth a reasonable, lead to a reasonable probability that your client was involved hip and thigh in this drug trafficking? No. I would disagree with that strongly. To suggest that a drug dealer or a drug trafficker, as the government alleges Garcia Jimenez is, and they've got looks like five controlled buys from him, by the way, none of which are at his residence. None of which are at his residence. They are all at the restaurant. I thought a drug deal took place the first time that the defendant dropped him off. I thought that's where this all began. Well, that's what I was referencing before. That's the November 24th where Garcia Jimenez says, I don't have any drugs. I'm out until November 30th. CI comes out, government searches him, and he's got a little bit on him. But we don't know where he went inside. There's no surveillance that says he went into apartment number 23. Go ahead. So, none of these deals are at the residence that the government thinks is so nefarious that my client's driving back and forth to, where Garcia Jimenez is one of many residents at some apartment building that we don't really know how big is. So, you're kind of in a catch-22. Is the defendant picking apart? Is the court picking apart all of these facts and looking at a hyper-technical standpoint? I guess that's one way you can look at it. But the only way to know if these facts in and of themselves or looking at it from a totality of the circumstance situation, are they actually indicative of criminal conduct? Or is it a situation where, well, we think, we suspect, it may look like? There's nothing in any of these warrants where the officer says this is indicative. 245 contacts between these two people, particularly during these particular time periods or X number of phone calls. Your time's getting shorter. And I did interrupt you, but I don't mean to do that unnecessarily. You can win all that and lose on Leon bigger in life. You got the point. Yes. So, do address the Leon point, and especially our standard, which you've noted and the other side's noted, that it must be entirely unreasonable. Was this the same district court judge in Iowa who did it all four times, all four warrants? Were they different judges, or do you know? Well, these were judges out of Minnesota, because a lot of this conduct occurred in Minnesota. Oh, okay. These were judges. So, the two judges, and it is interesting to note that a lot of the cases that this court has determined where Leon does apply, has one of the facts that regularly this court relies upon is to say, well, both the magistrate judge and the district court judge thought the warrant was good. Well, here it's the opposite. Both the magistrate judge and the district court judge say it was bad. No, I'm sorry. And I'm sorry. I'm talking about the state court judges. Yes. How many different state court judges were involved? Do you know? I believe it was two. Thank you. I believe it was two. I know that there's two. So, why was it entirely unreasonable, given all the smoke here and all the association, why was it entirely unreasonable for the officers to rely on that? Because that's the purpose of this rule. If you look at the warrant in its entirety, taking that same totality of the circumstances approach, if you look at the warrant in its entirety, defendant is a small smidge of it. It is all about Garcia-Jimenez and controlled buys with Garcia-Jimenez. And then we've got this ancillary inconsequential contact, phone calls, and my client being seen with them once in a mall out of state in a restaurant, and then going back and forth to an apartment building where this same guy lives. It's all consequential. There is nothing in any of these warrants that tie my client's car, which is the subject of this GPS device, his comings and goings in his car, there's nothing tying his car to any illegal conduct at all. Even in the third search warrant, when there's this controlled buy on March the 9th, again, confidential source talks to Garcia-Jimenez. Garcia-Jimenez says, go to the restaurant, go to an elevator, because all the deals are at the restaurant, get in an elevator, go in the elevator and go upstairs, and then you'll meet somebody. And the CI comes out and says, I met with this guy that I think is Juan Lopez Zuniga. No independent cooperation in that. Nobody sees that. It's just one person's statement. Nothing in there that says that this person is reliable or used before or given good information in the past. But even if you just assume that that's enough, there's no indication that my client's car or his comings and goings had anything whatsoever to do with that deal. I would think that would be a good argument, perhaps, in a case where you had a search of the car. But we don't have that. What we have is a tracker. Yes. Which is different, which is simply a device that is used to keep track of someone with respect to whom the government at least thought there was a fair probability that he was involved in drugs. It was not a search of the car. So I think your case is a little bit weaker on that account. I think it really comes down to whether or not there's any evidence in any of these search warrants that can be either strewn together or looked at independently that would suggest that. There's evidence that he was involved in a drug deal. And so that would give, it seems to me, a reasonable officer cause to believe that they might want to follow him around a little bit, see if he's going to do it again. There's no indication. I mean, they could follow him on foot, right? They could. They could follow his car. But the question is, does that rise to the level of probable cause or mere suspicion? I agree. And it's our position that there's no probable cause there because there's no indication that my client was coming or going before that deal, coming or going after that deal, or coming or going from any. His mode of transportation, his comings and goings don't line up at all with any of these controlled buys that the government alleges from 9.30 of 15 until 11.12 of 15. There's nothing there that indicates that my client's mode of transportation is involved in any way. And if warrants one and two are bad, then when you look at independently the probable cause for warrants three and four, you have to strike everything where they're talking about the comings and goings of defendant's vehicle because all of that would be out. My ill-advised, ill-considered trip down memory lane took some of your time, so would you go back to Judge Benton's question? Yes. Why doesn't Leon save all? I know you've addressed it in your brief, but. Well, Leon doesn't save it all because it's entirely unreasonable for any officer to have relied upon the validity of the warrants because they are so lacking in probable cause as to any participation by defendant in the illegal operation. There are notably, there are things that look suspect, the number of phone contacts, the fact that the car is going back and forth to an apartment building, but that's it. That's it. And the question is, do those facts rise to the level of providing probable cause that an officer could rely upon it as opposed to an officer looking at it and saying this whole thing has to do with Garcia Jimenez, and then we've got this other person who from time to time comes and goes, but the government doesn't do anything to line that up with any of the drug deals to say, other than this 1124, which is highly suspect of how that whole thing worked. But other than that deal, there's nothing else in all of these other six deals where the government says the comings and goings of the defendant or his transportation or his whereabouts somehow are suggestive of criminal conduct. Again, to compensate for my interruptions earlier, how would we, if it's necessary in legal terms to describe your client's involvement in this case, he's what, an innocent bystander? Friend of? Would you have to characterize him? I don't think you have to characterize him. As a practical matter, well, how would you characterize him? Employee of, he works at the restaurant. He works at the restaurant. He's an employee of, friend of. It's not untypical. I think the court, I'm sure, has seen a number of examples where individuals in small towns tend to band together if they're of the same ethnic background. So the fact that these two individuals are associated in some way doesn't automatically mean that they're associated in an illegal way or with an illegal enterprise. And so if he has a bad choice of companions, that doesn't damn him or doesn't indict him, put it that way. Well, it shouldn't. It shouldn't. I think there's case law that clearly says mere presence is not enough, and that's what this case appears to be. And as your response to the government's argument about the district court's opinion in Schermerhorn, the case in the eastern district of Missouri, does it? Completely different. Completely different. The court in Schermerhorn determined that the warrants were no good but determined that they were going to look outside the four corners of the warrant to determine if the officers reasonably relied upon it and relied then on the government's calling a live witness at the suppression hearing to fill in some of the blanks. Some of the blanks being when a duffel bag believed to have been drugged were put into defendant's vehicle, that was at the defendant's house. That was not in the original warrant. That the fact that it was the defendant that was driving to a location out of state that was a known drug house, that was not in the warrant. Well, you said it better than I. I mean, it's completely distinguishable, and we'll let it go at that. Let's see. Do we have other questions? I think I've tried to compensate for interrupting you. I think you did more than enough. Thank you. We thank you for your argument. Thank you. And we'll hear from the government on rebuttal. At the outset, I want to talk about that initial drug transaction, November 24th. It was a drug transaction. It talks about the undercover officer with an unwitting at the time, someone who had been under surveillance, someone who had been observed going to and from Garcia Jimenez's residence on numerous times in that search warrant one, goes there, they go in, come back out, he has drugs. I mean, why would you go to get drugs if you already have drugs? It's a drug deal. He being the unwitting that went in with the undercover officer staying outside, but the undercover officer's ordering up drugs from the unwitting who's getting it from Garcia Jimenez. He has drugs. They went to that residence. There's other documentation in that particular search warrant that talks about to and from the residence, unlike what counsel said. But this is probable cause determination of a GPS tracker warrant, as brought out. As I noted from counsel, what is a search warrant but a patchwork of articulable facts? I mean, you do put patchworks of articulable facts together from which you can draw reasonable inferences, and it's a probable cause determination, not a much higher standard at a much later point in business in the case. And finally, is it really entirely unreasonable for these officers to have relied on the validity of these warrants? We have two different officers, each with 20 years' experience, noted in each of their particular affidavits involved in narcotics investigations. And you have two different judges, as Judge Benton brought out, two different judges, one in Minnesota for the first two, one in Iowa for the second two, that each signed off on those particular warrants after being applied for by those officers. And you have Officer 2, who is relying, obviously, upon what Officer 1 did because he took some of that information, not all of it, but some of that information, and patchworked it into his particular two search warrants. What you have is, Shimmerhorn, I want to just speak about just one second. Shimmerhorn, there's a discussion of things that was not in the search warrants that they relied upon. And if you look at that, there's like an A, B, C in there. Each of those are actually in our search warrants. So what I'm saying is that we didn't need to get to things outside the search warrant to look at. There were tolls, there were short-term trafficking of the vehicles going to and from. There were extensive phone tolls. There was a connection between the person and the car. Those exist in the warrants. We don't need to go outside the warrants for those. Thank you. Well, we thank both sides. The case has been vigorously argued, and it is now being taken under consideration.